IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SHERRIE CARLSON SANDAU,

        Plaintiff,

                                            CV 07-632-PK

                                            FINDINGS AND

v.                                      RECOMMENDATION

JOHN A. WOOD, CHRISTOPHER CASS,
and CITY OF PORTLAND,

        Defendants.
_____

PAPAK, Magistrate Judge:

        Plaintiff Sherrie Carlson Sandau filed this action against defendants John A. Wood,

Christopher Cass, and City of Portland on April 27, 2007.  Sandau alleges that on July 8, 2005,

Portland Police Bureau Officers Wood[1] and Cass committed common law battery on her person

and violated her constitutional rights when the officers entered her home, used force to remove

---

      [1] Defendant Wood is no longer an officer of the Portland Police Bureau.

her from the premises, arrested her, and transported her to the Central Precinct clothed only in a shirt. She further alleges the City's *Monell* liability in connection with the individual defendants' alleged violation of her rights. Now before the court are the City of Portland's and Cass's motion (#63) for summary judgment, Wood's motion (#76) summary judgment, and Sandau's motion (#86) for leave to amend her complaint. I have considered the parties' motions, oral argument on behalf of the parties, and all of the pleadings on file. For the reasons set forth below, Sandau's motion for leave to amend her complaint should be granted, and the motions to dismiss should each be granted in part and denied in part, as set forth below.

## LEGAL STANDARD

### I.    Motion for Leave to Amend

After a defendant has filed a response to an initially-filed complaint, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Federal Civil Procedure Rule 15 specifies that "[t]he court should freely give leave when justice so requires." *Id.* The Ninth Circuit has specified that Rule 15 is to be interpreted with "extreme liberality," *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990), *citing United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981), although leave to amend is nevertheless "not to be granted automatically," *id.*

### II.    Motion for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues

Page 2 - FINDINGS AND RECOMMENDATION

exist for trial.  *See*, *e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996).  In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence.  *See*, *e.g.*, *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## FACTUAL BACKGROUND

### I.    Material Facts

On July 7, 2005, Sandau fell off a ladder while painting her porch, causing her to experience disorientation and a sever headache.  In the wee hours of the following morning, at approximately 1:00 a.m. on July 8, her neighbor, Carrie Luse, called Sandau on the telephone to complain that Sandau's dog was barking.  Luse's call awakened Sandau and caused her to experience difficulty in returning to sleep.  According to Luse's report, Sandau responded by shouting threats and insults at Luse, although Sandau indicates that she has no recollection of doing so.  Luse responded to the alleged threats by calling the police.

At approximately 5:40 a.m. on July 8, defendant Wood arrived at Luse's house in response to her call.  After interviewing Luse, Wood went to Sandau's door and knocked. Sandau answered the door and responded to Wood's questions with slurred and irrational speech and insults.  Wood provided Sandau with a business card for neighborhood mediation services and left.  After leaving Sandau's premises, Wood returned briefly to Luse's home to advise her of the actions he had taken.  As he was leaving Luse's home, Sandau banged on her window and

Page 3 - FINDINGS AND RECOMMENDATION

screamed, "You want noise?  I'll give you noise!"

Apparently concerned with the state of Sandau's mental health, Wood called Project Respond, an organization that intervenes in mental health crisis situations.  Wood also requested police backup.  While waiting for responses to his calls, Wood heard Sandau continue to scream and bang on her windows before ultimately quieting down.

Defendant Cass arrived on the scene in response to Wood's call.  Both officers waited for Project Respond to arrive before taking further action.  At approximately 6:30 a.m., two mental health workers arrived from Project Respond.  Upon the arrival of the mental health workers, Wood and Cass knocked at Sandau's front door, leaving the mental health workers on the sidewalk behind them.

The officers testified that they heard Sandau moving around inside the house, but that she did not open the door despite repeated knocks and announcements of their presence as police. Wood tried the door handle, and found it unlocked.  When he opened the door, he encountered Sandau immediately on the other side.  Apparently Sandau attempted to close the door, but Wood jammed it open with a foot and arm.  It is Wood's testimony that Sandau next attempted to "swipe" at Wood's arm with her hand, whereupon Wood grabbed Sandau's arm, apparently hard enough to leave bruises, and dragged her out of her house onto the porch, where Cass took hold of her other arm.  Together, the two officers placed Sandau in handcuffs.  Sandau was wearing a long tank-top T-shirt that extended down to her mid-thigh, a shorter T-shirt underneath that, and no other clothing.[2]

_____

[2]  Sandau alleges that her "entire pubic area and lower half" were exposed at this time and that they remained exposed from that time until, hours later, she was given pants to wear while held in police custody at the Justice Center.  By contrast, the officers allege that it was not

Once Sandau was in cuffs on her porch, the mental health workers attempted to ask her questions, but she was unresponsive and continued to direct invective at the arresting officers. When Sandau proved unresponsive to the mental health workers' questions, Wood told her she was under arrest, and the two officers escorted her to Wood's car and placed her inside.  During the walk to the car, Sandau requested that she be permitted to wear pants, but the officers ignored her requests.  Once inside the car, Sandau repeated her request for pants, but the officers again ignored her requests.

After putting Sandau in Wood's car, both officers entered Sandau's home, apparently to secure it and to ensure there were no injured persons inside.

Sandau was taken to the Portland Police Bureau's Central Precinct where she was fingerprinted and photographed before she was given pants to wear.  She alleges that an unidentified person lifted her tank top, exposing her pubic region, and said, "oh, no pants" before she was given clothing.  She was held for eight or nine hours, during which time she experienced chest pains.

On August 1, 2005, Sandau was charged with one count of  Disorderly Conduct in the Second Degree, a Class B *misdemeanor*, the elements of which are set forth in O.R.S. 166.025. Ultimately, however, the prosecutor elected to go forward prosecuting the charge as a Class A *violation* of Section 025, at his own election pursuant to O.R.S. 161.566.  On February 27, 2006, Sandau's case went to trial in Multnomah County, Judge Colas presiding.  In the course of those proceedings, Sandau's criminal defense attorney moved to suppress evidence on the theory that

---

apparent that Sandau was not wearing any additional clothing until Wood put Sandau in his police car for transportation to the Justice Center.

Page 5 - FINDINGS AND RECOMMENDATION

Wood's initial entry into Sandau's home had been unlawful.[3]  The court denied the motion on the

ground that the entry was lawful.[4]  Sandau was ultimately convicted of the violation of disorderly

conduct in the second degree.

## II.    Procedural History

Sandau filed this action on April 27, 2007.  In her complaint as originally filed, Sandau

alleged a claim under 42 U.S.C. § 1983 against all defendants[5] for violation of her Fourth

Amendment right to freedom from unreasonable seizure, a second Section 1983 claim against all

defendants for violation of her Fourth Amendment right to freedom from intrusion upon her

bodily integrity, a third Section 1983 claim against all defendants for violation of her Fourteenth

Amendment right to freedom from intrusion upon her bodily integrity, a fourth Section 1983

claim against all defendants for violation of her Fourteenth Amendment right to privacy, and a

claim for common-law battery against defendant Wood only.  On July 2, 2007, Sandau amended

her complaint to allege two counts of a single Section 1983 claim against all defendants for

violation of her Fourth Amendment rights to freedom from unreasonable seizure and to privacy

and freedom from intrusion on her bodily integrity, a second Section 1983 claim against

defendants Cass and Wood for violation of her Fourteenth Amendment due process rights, and a

---

[3]  In fact all of the evidence underlying the disorderly conduct charge was obtained prior
to Wood's entry into Sandau's home.

[4]  The court did not address the fact that the evidence that was the subject of the motion to
suppress had been obtained prior to the allegedly improper entry.

[5]  All claims against defendant City of Portland, whether alleged in Sandau's complaint as
originally filed or in a subsequent, amended pleading, are premised on allegations that the City
maintained a custom, policy, or practice that caused the individual defendants' alleged
misconduct.

claim for common-law battery against both Cass and Wood.  On October 2, 2007, I

recommended that defendants' motion under Federal Civil Procedure Rule 12 be granted as to

Sandau's Section 1983 claim premised on the violation of her Fourteenth Amendment rights, and

on February 6, 2008, Judge Mosman adopted that recommendation and dismissed the Fourteenth

Amendment claim.

## ANALYSIS

**I.      Motion for Leave to Amend**

As noted above, in her first amended complaint Sandau alleges two counts of a claim

against all defendants under 42 U.S.C. § 1983 for violation of her Fourth Amendment rights to

freedom from unreasonable seizure and to privacy and freedom from intrusion on her bodily

integrity, a second Section 1983 claim against defendants Cass and Wood for violation of her

Fourteenth Amendment due process rights, and a claim for common-law battery against

defendants Cass and Wood.  Sandau proposes modifying her pleading to (1) revise the

complaint's factual allegations to correct minor errors and to conform to the evidence, (2)

eliminate from the complaint the already-dismissed Section 1983 claim premised on violation of

Sandau's Fourteenth Amendment rights, (3) allege the claim for battery against defendant Wood

only, and (4) include new allegations regarding the unconstitutionality of the City's policy

implementing and/or regarding Oregon's so-called community caretaking statute under which

defendants argue that the entries into Sandau's home were lawful.  Defendants do not object to

any of the modifications except those relating to the alleged unconstitutionality of the policy

regarding the community caretaking statute.

A district court may deny a motion for leave to amend a pleading only "if permitting an

Page 7 - FINDINGS AND RECOMMENDATION

amendment would prejudice the opposing party, produce an undue delay in the litigation, or result in futility for lack of merit." *Jackson*, 902 F.2d at 1387, *citing Foman v. Davis*, 371 U.S. 178, 182 (1962). Moreover, it is well settled that, of these factors, the most important is the potential for prejudice to opposing parties. *See id.*, *citing Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330-31 (1971). Here, it is clear that the proposed modifications would neither delay litigation nor result in futility. Defendants do argue, however, that they would be unfairly prejudiced by permitting the amendment to go forward, in that it could potentially require additional discovery or a new round of dispositive motions.

Defendants' argument notwithstanding, the proposed amendments would not cause unfair prejudice. Sandau's currently operative pleading alleges the municipal defendant's liability under 42 U.S.C. § 1983 on the theory that the City maintained a custom, policy, or practice that caused the individual defendants to violate her federally protected rights. Rather than creating any new claim or new theory of liability, the sole import of the proposed new allegations relating to the policy implementing the community caretaking statute is to state with increased clarity the policy underlying Sandau's theory of municipal liability. Moreover, there appears to be no requirement that Sandau plead the unconstitutionality of the policy before she may argue its unconstitutionality in support of her Fourth Amendment claim. Thus, the proposed modification would provide defendants with potentially helpful clarification rather than impose any new burden on them.

Because the proposed amended pleading would not prejudice defendants, unduly delay this litigation, or result in futility, justice requires that Sandau be granted leave to amend her pleading a second time. Sandau's motion (#86) for leave to amend her pleading should therefore

be granted.

## II.    Dispositive Motions

As amended, Sandau's complaint will state two counts of a claim under 42 U.S.C. § 1983 against all defendants for violation of her Fourth Amendment rights to freedom from unreasonable seizure and to privacy and freedom from intrusion on her bodily integrity, and a claim against defendant Wood only for common-law battery.  The Section 1983 claim is premised on then-Officer Wood's initial entry into Sandau's home, the officers' use of force in effecting Sandau's arrest, the officers' actions in transporting Sandau to the Central Precinct and permitting her to be processed there without providing her with clothing or other coverage for the lower half of her body, and the officers' second entry into Sandau's home following her arrest, each allegedly in violation of Sandau's rights under the Fourth Amendment.  The City's liability on the Section 1983 claim is premised on its alleged "custom, policy or practice of handcuffing, arresting, transporting, and processing citizens. . . without permitting them to dress or cover their nakedness" and on its policy implementing the community caretaking statute, also allegedly in violation of Sandau's Fourth Amendment rights.  The battery claim is premised on Wood's use of force in removing Sandau from her home and placing her in handcuffs.  Defendant Wood and, separately, defendants Cass and the City of Portland move for summary judgment on each of Sandau's claims.

### A.    42 U.S.C. § 1983

42 U.S.C. § 1983 provides a mechanism whereby civil rights plaintiffs may bring actions to redress violations of federally protected rights.  *See*, *e.g.*, *Monroe v. Pape*, 365 U.S. 167, 172 (1961).  Sandau's Section 1983 claim is premised on the defendants' violation of her rights to

freedom from unreasonable seizure and to privacy and freedom from intrusion on her bodily integrity under the Fourth Amendment. Sandau alleges that her Fourth Amendment rights were violated when defendant Wood entered her home without a warrant or exigent circumstances, when defendants Wood and Cass used excessive force to effect her arrest, when the officers transported and processed her while she was not fully clothed, and when both officers entered her home following her arrest.

Both sets of defendants argue that by operation of the doctrine of issue preclusion, Sandau is foreclosed from relitigating whether the officers' entries into her home were constitutional. In addition, both sets of defendants argue that under the doctrine articulated by the Supreme Court in *Heck v. Humphrey*, 512 U.S. 477 (1994), Sandau is precluded from pursuing her Section 1983 claim to the extent premised on the officers' entries into her home or her arrest, on the ground that were she to prevail as to those issues her victory would impermissibly call the validity of her conviction for disorderly conduct into question.

Defendants Cass and the City of Portland[6] further argue that Cass's use of force was constitutionally reasonable. Similarly, both sets of defendants argue that the manner of Sandau's arrest was likewise constitutional. Additionally and/or in the alternative, both sets of defendants argue that both Wood and Cass are entitled to qualified immunity for the entries into Sandau's home, for the use of force against Sandau, and for Sandau's transportation to the Justice Center

---

[6] Counsel for defendants Cass and the City of Portland filed briefs on behalf of both parties without articulating separate, discrete arguments on each party's behalf. Discussion of the arguments advanced on behalf of these parties should not be construed as suggesting, for example, that the City has standing to argue that Cass has qualified immunity in connection with Sandau's allegations of excessive force, or that Cass has standing to argue that the City is not liable on a *Monell* theory.

Page 10 - FINDINGS AND RECOMMENDATION

while in a state of partial undress.

With regard to Sandau's theory of municipal liability, defendants Cass and the City of Portland argue that the City cannot be liable on Sandau's claims because Sandau suffered no constitutional violation. In the alternative, these defendants argue that the City cannot be liable because it had no policy or custom that could have caused the deprivations of constitutional rights that Sandau alleges.

Finally, defendant Wood argues that the battery claim must fail because it stands or falls with the Section 1983 claim to the extent that claim is premised on Wood's use of force in effecting Sandau's arrest.

### 1.    Preclusion Theories

#### a.    Issue Preclusion

Defendants argue that Sandau's conviction for disorderly conduct, including in particular the state court's adverse ruling on her motion to suppress evidence based on the alleged unreasonableness of Wood's initial entry into her home, precludes Sandau from relitigating the constitutionality of that entry. The preclusive effect of a state court action is governed by the state's law of issue preclusion. *See Dodd v. Hood River County*, 136 F.3d 1219, 1225 (9th Cir. 1998). Under Oregon law:

> If one tribunal has decided an issue, the decision on that issue may preclude relitigation of the issue in another proceeding if five requirements are met:
>
> 1. The issue in the two proceedings is identical.
>
> 2. The issue was actually litigated and was essential to a final decision on the merits in the prior proceeding.
>
> 3. The party sought to be precluded has had a full and fair opportunity to

be heard on that issue.

4. The party sought to be precluded was a party or was in privity with a party to the prior proceeding.

5. The prior proceeding was the type of proceeding to which this court will give preclusive effect.

*Nelson v. Emerald People's Util. Dist.*, 318 Or. 99, 104 (1993) (citations omitted); *see also*, *e.g.*,

*Barackman v. Anderson*, 214 Or. App. 660, 664 (2007) (same).

Sandau was tried for disorderly conduct in the Multnomah County Circuit Court. At trial, her attorney moved to suppress evidence of her conduct on the stated ground that it would not have been obtained but for Wood's allegedly unconstitutional entry into Sandau's home. Judge Colas heard and denied the motion to suppress. It is not clear whether Judge Colas considered the fact, indisputable in hindsight, that all of the evidence that the judge ultimately relied upon in finding Sandau guilty as charged, including all relevant testimony by Luse and Wood, related to conduct taking place *before* Wood entered Sandau's home. The record establishes only that Judge Colas denied the motion on the ground that Wood's entry into Sandau's home was lawful under Oregon's community caretaking statute, O.R.S. 133.033.

On these facts, it is clear that the issue of the lawfulness of Wood's first entry into Sandau's home is identical across the two proceedings, that it was actually litigated at the hearing on the motion to suppress, and that Sandau, a party to both proceedings, had a full and fair opportunity to litigate the issue in the prior proceeding. Moreover, it is clear that Sandau's disorderly conduct trial is the type of proceeding to which the Oregon courts give preclusive effect. *See*, *e.g.*, *State Farm Fire & Cas. Co. v. Sallak*, 140 Or. App. 89, 92 (1996); *Meyers v. Burwell*, 271 Or. 84, 89 (1975). The only point of serious contention is whether the state court's

Page 12 - FINDINGS AND RECOMMENDATION

decision on the motion to suppress was "essential" to its final decision on the merits.

The Oregon courts have explained that "issue preclusion . . . precludes future litigation on a subject issue *only* if the issue was actually litigated and determined *in a setting where its determination was essential to the final decision*."  *Hayes Oyster Co. v. Dulcich*, 199 Or. App. 43, 49 (2005) (emphasis supplied; internal quotation marks omitted), *quoting Drews v. EBI Companies*, 310 Or. 134, 139-40 (1990), *quoting North Clackamas School Dist. v. White*, 305 Or. 48, 53 (1988); *see also*, *e.g.*, *Portland Pub. Sch. Dist. No. 1J v. Portland Custodian Civ. Serv. Bd.*, 198 Or. App. 11, 19 (2005) (analyzing whether final decision could have been reached if a different determination had been made on a litigated issue in order to determine whether the issue was essential to the final decision); *State v. Stephens*, 184 Or. App. 556, 564 (2002) (holding that in the absence of "final judgment . . .  to which the disposition of [a] suppression motion was an essential part," erroneous to give preclusive effect to a trial court's decision on the suppression motion); *Becker v. Pieper*, 176 Or. App. 635, 646-647, 647 (2001) (holding that where final judgment in a prior decision could have been reached on a basis other than the one purportedly relied upon by the prior tribunal, issue preclusion is inapplicable because the prior tribunal's determination was not essential to its judgment; "the reasoning that leads to the ultimate decision is . . . preclusive only if it is essential to the ultimate decision").  Here, Judge Colas expressly based his final judgment on evidence that was indisputably obtained *prior* to Wood's entry into Sandau's home:

> I do find that the noise created by defendant, the screaming, pounding, and the name calling witnessed and testified to independently by the police officer [Wood] and the victim [Luse] were not communicative in nature but were intended in fact to disturb.  I do find . . . the state has proved by preponderance of the evidence that the defendant committed th[e] [offense of disorderly conduct].

Page 13 - FINDINGS AND RECOMMENDATION

Transcript of Proceedings Before the Multnomah County Circuit Court, 133:6-13.  That is, Judge Colas based his judgment against Sandau on evidence that as a matter of law could not have been within the scope of Sandau's motion to suppress.

The setting in which the lawfulness of Wood's entry was actually litigated, therefore, was not one in which the determination was essential to the court's final decision.  The judgment against Sandau would not have been disturbed or modified in any degree by the finding that Wood's entry was unlawful, or by the exclusion of any evidence obtained as a consequence of that entry.  As a matter of Oregon law, therefore, the Multnomah County Circuit Court's finding that Wood's entry was lawful pursuant to the community caretaking statute is not entitled to preclusive effect in the proceeding now before this court.  Defendants' respective motions for summary judgment should therefore each be denied to the extent premised on the doctrine of issue preclusion.

**b.**      ***Heck v. Humphrey***

"Civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments."  *Heck v. Humphrey*, 512 U.S. 477, 486 (1994).  Thus, when a plaintiff seeks damages in a Section 1983 suit, "the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of the plaintiff's conviction or sentence."  *Id.* at 487.  If it would do so, the court must dismiss the claim "unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated."  *Id.*  Here, defendants argue that if Sandau were to prevail on her Section 1983 claim to the extent premised on Wood's initial entry into her home, her success would necessarily invalidate her conviction for disorderly conduct.  Defendants' argument is not well taken.

Page 14 - FINDINGS AND RECOMMENDATION

O.R.S. 161.566 permits prosecuting attorneys to elect to treat any misdemeanor offense, such as that codified at O.R.S. 166.025 for disorderly conduct, as a "Class A violation," or civil offense. Sandau's prosecutor exercised discretion so to treat the charge against Sandau. One consequence of this election was to render the judgment against Sandau civil rather than criminal, thus removing it from the scope of the *Heck* doctrine, which expressly applies only to criminal judgments.

To determine whether an ostensibly civil proceeding such as the disorderly conduct proceeding against Sandau is, in fact, criminal in nature, the Oregon courts first determine whether the legislature intended to create a civil proceeding and next, if the legislature did so intend, apply the following factors, identified as possible indicators of criminal proceedings:

> (1) the use of pretrial procedures that are associated with the criminal law, such as indictment, arrest, and detention; (2) the potential for imposition of a penalty that is historically criminal or "infamous," or that cannot be justified fully in terms of the civil purposes that the penalty supposedly serves; and (3) the potential for a judgment or penalty that carries public stigma; (4) the potential for collateral consequences that, either taken by themselves or added to the direct consequences of the underlying forbidden acts, amount to criminal penalties.

*State v. Selness*, 334 Or. 515, 536 (2002).

The Oregon Court of Appeals has specifically determined that in enacting O.R.S. 161.566 the legislature "intended . . . to create civil proceedings for violations." *State v. Page*, 200 Or. App. 55, 61 (2005).[7] In consequence, the court must examine the four *Selness* factors to

---

[7] The *Page* court applied the four *Selness* factors to a conviction for Driving While Suspended that a prosecutor had elected pursuant to Section 566 to treat as a violation rather than a misdemeanor. The court found that only one factor – the use of pretrial procedures associated with the criminal law – mitigated in favor of a finding that the proceedings were criminal in nature. *See Page*, 200 Or. App. at 61-64. The court concluded that "the proceeding against defendant for DWS did not become criminal in nature based solely on the available pretrial procedures." *Id.* at 64.

determine whether Sandau's conviction was criminal or civil.  *See id.*  Because the pretrial procedures she underwent in connection with the disorderly conduct charge against her did not differ from available criminal procedures, the first factor mitigates in favor of finding the proceedings to have been criminal.

By contrast, the second factor, the penalty to which Sandau could have been subject, mitigates in favor of concluding that the proceedings were civil.  She could have received up to a $2,500 fine, the same maximum penalty available for criminal convictions.  For *Selness* purposes, however, a fine can only be criminal in nature if its severity "cannot be justified fully in terms of the civil purposes that the penalty supposedly serves." *Selness*, 335 Or. at 536.  In this regard, the Oregon Supreme Court opined in 1977 that "a $1,000 fine, if not in itself a criminal rather than civil penalty, must be at the margin of legislative discretion." *Brown v. Multnomah County Dist. Court*, 280 Or. 95, 105 (1977).  I take judicial notice that, adjusted for inflation, the purchasing power of $1,000 in 1977 dollars exceeds the purchasing power of $2,500 in 2009 dollars, such that the fine remains within "legislative discretion" to be civil rather than criminal. In the absence of any other penalty, the maximum penalty that could have attached in the state court proceedings suggests that the proceedings were civil rather than criminal.

The third factor, the public stigma associated with the conviction, likewise mitigates in favor of a civil finding.  I am persuaded that a clear effect, and perhaps the primary effect of the election to treat the charge against Sandau as a civil violation rather than as a criminal misdemeanor, was to reduce any stigma associated with her conviction below the level associated with conviction for criminal acts.  Similarly, the fourth factor mitigates in favor of a finding that the proceedings were civil.  Sandau's conviction carried no potential for material collateral

consequences.

With only one of the four factors weighing in favor of the conclusion that the proceedings against Sandau were criminal, the Oregon courts would conclude that the proceedings were necessarily civil. *See Page*, 200 Or. App. at 64. Because under the *Selness* framework the proceedings against Sandau were civil rather than criminal in nature, the *Heck* doctrine is inapplicable.

Moreover, even if *Heck* were applicable, a plaintiff's verdict on her Section 1983 claim would not undermine her state conviction since it was obtained solely on the basis of information obtained prior to the allegedly improper entry into her home. That is, Sandau may concede that her conduct was disorderly and that she was properly convicted under Section 025 without contradicting her allegation that Wood improperly entered her home without a warrant or a combination of probable cause and exigent circumstances. Assuming *arguendo* that the disorderly conduct proceedings against Sandau were criminal rather than civil, *Heck* would not bar Sandau's Section 1983 claim because there could be no tension between these proceedings and the state court's judgment. Defendants' respective motions for summary judgment should therefore each be denied to the extent premised on the *Heck* doctrine.

### 2.    Claim Under 42 U.S.C. § 1983 as to the Individual Defendants

As noted above, Sandau's claim under 42 U.S.C. § 1983 is premised on the alleged violation of her rights protected by the Fourth Amendment. Sandau alleges that Wood and Cass violated her Fourth Amendment rights when Wood initially entered her home, when Wood and Cass used excessive force to effect her arrest, when the officers caused her to be transported to the Central Precinct and processed while only partially clothed, and when the officers entered her

Page 17 - FINDINGS AND RECOMMENDATION

home following her arrest.

Both individual defendants claim qualified immunity in connection with each of the alleged violations of Sandau's Fourth Amendment rights.  The United States Supreme Court recently restated the purpose of the qualified immunity doctrine as follows:

> The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.  The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.

*Pearson v. Callahan*, – U.S. –, 129 S. Ct. 808, 815 (2009) (citations, internal quotation marks omitted).

The qualified immunity analysis consists of two steps.  One step analyzes whether a constitutional right was violated, while the other examines whether the right was clearly established.  Following *Pearson*, the courts are permitted to perform these steps in whichever order is more appropriate under the circumstances of the case, considering the development of the facts and legal issues in the record before the court and the stage of proceedings at which the qualified immunity issue is examined.  *See Pearson*, 129 S. Ct. at 818.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  Nevertheless, the Supreme Court has rejected any requirement that a plaintiff demonstrate the existence of a "fundamentally similar" or "materially similar" case in order to defeat an assertion of qualified immunity.  *Hope v. Pelzer*,

536 U.S. 730, 741 (2002). Rather, there may be "notable factual distinctions between the

precedents relied on . . . so long as the prior decisions give reasonable warning that the conduct

then at issue violated constitutional rights." *Id.* at 740 (quotation omitted).

The Supreme Court has held that the broad protections of the qualified immunity doctrine

are applicable to "all but the plainly incompetent or those who knowingly violate the law."

*Malley v. Briggs*, 475 U.S. 335, 341 (1986) ("if officers of reasonable competence could disagree

[as to the constitutionality of the complained-of conduct], immunity should be recognized.").

Here, because Sandau has alleged the City's municipal liability in connection with the

entries into her home and the manner of her arrest, it will be necessary with regard to three of the

four violations alleged to analyze whether a constitutional violation occurred regardless of

whether the officers enjoy qualified immunity. It is therefore appropriate to determine first

whether the record permits the determination that a constitutional violation occurred in

connection with each of the four occurrences, and then to determine whether any violated

constitutional right was clearly established at the time the violation took place.

### a.    Warrantless Entries

"The Fourth Amendment prohibits police officers from making a warrantless entry into a

person's home, unless the officers have probable cause *and* are presented with exigent

circumstances." *LaLonde v. County of Riverside*, 204 F.3d 947, 954 (9th Cir. 2000) (emphasis

original), *citing Payton v. New York*, 445 U.S. 573, 590 (1980); *United States v. Prescott*, 581

F.2d 1343, 1350 (9th Cir. 1978). "It is a basic principle of Fourth Amendment law that searches

and seizures inside a home without a warrant are presumptively unreasonable." *Id.* (internal

quotation marks omitted), *quoting Payton*, 445 U.S. at 586.

"The Fourth Amendment's prohibition on warrantless entry into an individual's home does not apply to arrests made at the doorway, because the doorway is considered a public place." *Id.* at 955, *citing United States v. Santana*, 427 U.S. 38 (1976); *United States v. Vaneaton*, 49 F.3d 1423, 1427 (9th Cir. 1995). However, where, as here, the arrest occurs after the threshold is crossed, the doorway exception is inapplicable. *See id.*

> Supreme Court and Ninth Circuit cases have strictly limited the exigency exception, especially in the context of warrantless arrests in the home. In *Welsh v. Wisconsin*, 466 U.S. 740, 80 L. Ed. 2d 732, 104 S. Ct. 2091 (1984), the Supreme Court explained:
>
>> The police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests. Indeed, the Court has recognized only a few such emergency conditions, *see, e.g.*, *United States v. Santana*, 427 U.S. 38, 42-43, 49 L. Ed. 2d 300, 96 S. Ct. 2406 (1976) (hot pursuit of a fleeing felon); *Warden v. Hayden*, 387 U.S. 294, 298-299, 18 L. Ed. 2d 782, 87 S. Ct. 1642, (1967) (same); *Schmerber v. California*, 384 U.S. 757, 770-771, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (1966) (destruction of evidence); *Michigan v. Tyler*, 436 U.S. 499, 509, 56 L. Ed. 2d 486, 98 S. Ct. 1942 (1978) (ongoing fire), and has actually applied only the 'hot pursuit' doctrine to arrests in the home.
>
> *Welsh*, 466 U.S. at 749-50; *see also Minnesota v. Olson*, 495 U.S. 91, 100, 109 L. Ed. 2d 85, 110 S. Ct. 1684 (1990). In describing the "heavy burden" outlined in *Welsh*, we have explained that police "can meet that burden only by 'demonstrating specific and articulable facts to justify the finding of exigent circumstances.'" *United States v. Shephard*, 21 F.3d 933, 938 (9th Cir. 1994) (*quoting United States v. Driver*, 776 F.2d 807, 810 (9th Cir. 1985)). We have also explained that "this burden is not satisfied by leading a court to speculate about what may or might have been the circumstances." *Driver*, 776 F.2d at 810; *see also United States v. George*, 883 F.2d 1407, 1411 (9th Cir. 1989).

*Id.* at 957.

> There are two general exceptions to the warrant requirement for home searches: exigency and emergency. Under the exigency doctrine, a warrantless search of a home is permitted if there is probable cause to believe that contraband or evidence of a crime will be found at the premises and that exigent circumstances exist. *United States v. Lai*, 944 F.2d 1434, 1441 (9th Cir. 1991) (abrogated on other

grounds).  As a general rule, "we define exigent circumstances as those circumstances that would cause a reasonable person to believe that entry . . . was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts."  *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984) (*en banc*) (abrogated on other grounds).  . . .

\* \* \*

The emergency exception to the warrant requirement contains three requirements:

> (1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property. (2) The search must not be primarily motivated by intent to arrest and seize evidence. (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.

*Id.* (*quoting People v. Mitchell*, 39 N.Y.2d 173, 347 N.E.2d. 607, 609, 383 N.Y.S.2d 246 (N.Y. 1976)).

*United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005).

i.        **Constitutional Violation**

\*        **Wood's Initial Entry**

Wood initially entered Sandau's home at or shortly after approximately 6:30 a.m. on July 8, 2005, after Wood and Cass had knocked at Sandau's door without receiving any response. Wood tried the door handle, found it unlocked, and opened the door.  Sandau apparently attempted to close the door, whereupon Wood jammed it open with his foot and one arm. Sandau may have approached Wood or attempted to dislodge him from her doorway or to strike at him, prompting Wood to take hold of her and drag her from her home.

It is undisputed that Wood lacked either a warrant or Sandau's consent to enter the premises.  The question for this court, therefore, is whether either the exigency or the emergency

Page 21 - FINDINGS AND RECOMMENDATION

exception applies to Wood's initial entry.  In connection with this inquiry, it is worth noting that

Sandau is precluded from relitigating the question whether Wood had probable cause to believe

that evidence of a crime would be found within the premises, because that issue was actually

litigated in a court proceeding to which Sandau was a party and was essential to the disorderly

conduct judgment against her.  *See*, *e.g.*, *Nelson*, 318 Or. at 104.

As to the exigency exception, the critical determination, therefore, is whether a

reasonable person could have believed under all of the circumstances of the case that entry "was

necessary to prevent physical harm to the officers or other persons, the destruction of relevant

evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate

law enforcement efforts. . . "  *Martinez*, 406 F.3d at 1164.  At the time he entered Sandau's home

Wood had received Luse's report that Sandau had shouted threats and insults during the

preceding night, and had personally observed Sandau behaving erratically and with hostility.

In *United States v. Brooks*, 367 F.3d 1128, 1135 (9th Cir. 2004), the court applied the

exigency doctrine to allow entry when the officers effecting the entry had heard loud fighting,

saw evidence that violence had taken place, and knew that the victim of the violence was within

the premises to be entered.  The *Brooks* court determined that the entering officers had an exigent

need to enter the premises to ensure the safety of the victim.  *See id.*  Here, by contrast, Wood

lacked evidence that any person other than Sandau was within the premises, that violence had

occurred or was imminent, or that entering the premises was necessary to prevent harm to any

person.  In the absence of any evidence that, but for entry, some cognizable harm would occur,

the exigency exception is necessarily inapplicable.

The critical determination in connection with the emergency exception is similar, namely,

whether Wood had reasonable grounds to believe that an emergency existed giving rise to an immediate need for his assistance in order to protect life or property. *See Martinez*, 406 F.3d at 1164. At the time he effected his entry into Sandau's home, Wood was able to hear Sandau moving about within her home, and was in possession of no evidence to suggest that his immediate entry was necessary to prevent her from harming herself or others. In the absence of any such evidence, the emergency exception, like the exigency exception, is necessarily inapplicable.

Because Wood entered Sandau's home without a warrant, without Sandau's consent, and in the absence of circumstances giving rise to either the exigency or the emergency exception to the Fourth Amendment prohibition of warrantless entries, the initial entry into Sandau's home was constitutionally improper. Defendants' respective motions for summary judgment should therefore each be denied to the extent premised on the theory that Sandau suffered no deprivation of constitutional rights in connection with Wood's initial entry.[8]

**\*    The Officers' Entry Following Sandau's Arrest**

Following Sandau's arrest, both Wood and Cass entered Sandau's home for the stated purpose of securing it in Sandau's absence. At the time they effected their entry, the officers knew that Sandau was in their custody, and that in consequence she was unable to secure the premises herself. They were also aware that at least one door was unlocked. These facts gave rise to a reasonable belief that their immediate assistance was necessary to prevent potential harm to Sandau's property. There is no evidence in the record to suggest that the officers intended to

---

[8] Wood's reliance on the community caretaking statute is without impact on the foregoing analysis. Wood's conduct must be considered according to standards of conduct established by the Fourth Amendment, without regard to the provisions of the Oregon statute.

Page 23 - FINDINGS AND RECOMMENDATION

search or did search the premises for contraband or other evidence of crime while they were inside.

On these facts, the emergency exception to the Fourth Amendment prohibition of warrantless entries is applicable. *See Martinez*, 406 F.3d at 1164. Sandau therefore suffered no deprivation of her constitutional rights in connection with the second entry. Defendants' respective motions for summary judgment should be granted to the extent premised on the theory that Sandau suffered no deprivation of constitutional rights in connection with the officers' post-arrest entry into Sandau's home.

### ii. Qualified Immunity

Because the record does not permit the determination that Sandau's constitutional rights were violated in connection with the officers' entry into her home following her arrest, it is only necessary to conduct the qualified immunity analysis in connection with Wood's initial entry. The relevant inquiry is whether any reasonable police officer could have believed that it would be constitutionally proper to enter Sandau's home under the circumstances Wood was aware of at the time he effected his entry. *See, e.g., Saucier*, 533 U.S. at 202; *Malley*, 475 U.S. at 341.

On the facts in the record, I cannot say that it was necessarily unreasonable for Wood to determine that he could properly enter Sandau's home. Sandau's behavior had been erratic, both according to Luse's report and according to his own observation. Sandau had made threats and displayed hostility. Her behavior could have created a question in the mind of a reasonable police officer as to whether she presented a threat either to herself or to Luse. Given the possibility that Sandau might have presented such a threat, an officer could reasonably, if incorrectly, have believed that entry was proper under the exigency exception.

Page 24 - FINDINGS AND RECOMMENDATION

Because a reasonable officer could, under the circumstances Wood had knowledge of, have believed that entry would be within the scope of the exigency exception, Wood is entitled to qualified immunity for the initial entry into Sandau's home. To the extent Cass may be the subject of Sandau's Section 1983 claim premised on the initial entry, he too is entitled to qualified immunity. Defendants' respective motions for summary judgment should therefore each be granted as to defendants Wood and Cass only to the extent premised on the theory that the officers enjoyed qualified immunity in connection with the initial entry.

> **b.  Use of Force**

Sandau asserts that Wood bruised her arm when he took hold of her and pulled her out of her home following his initial entry. She further asserts that Cass held her other arm while Wood placed her in handcuffs, without leaving bruises. Sandau alleges that this use of force in effecting her arrest was constitutionally excessive. It is worth noting in this regard that, as discussed above, the propriety of her arrest is not in dispute, and may not be relitigated in the course of these proceedings.

The Supreme Court has held that:

> Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

Page 25 - FINDINGS AND RECOMMENDATION

The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.

As in other Fourth Amendment contexts, however, the reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

*Graham v. Connor*, 490 U.S. 386, 396-397 (1989) (citations, internal quotation marks, and internal modifications omitted).

The Ninth Circuit performs a three-steep analysis for determining the reasonableness of non-deadly force used to effect a seizure:

First, we assess the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force inflicted. . . . Second, we assess the importance of the government interests at stake by evaluating: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. . . . Third, we balance the gravity of the intrusion on the individual against the government's need for that intrusion to determine whether it was constitutionally reasonable.

*Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003) (citations omitted).

Here, the alleged intrusion on Sandau's Fourth Amendment interests was slight. She was bruised in the course of her altercation with the officers, but the record does not suggest that she suffered any significant injury. Moreover, given the irrationality of Sandau's behavior and her irresponsiveness to questioning, the officers had a reasonable interest in controlling and restraining Sandau, in order to protect themselves and to protect Sandau from any more serious injury. Balancing these two interests, I find that the officers' use of force in effecting Sandau's

arrest was clearly constitutionally reasonable.  Because Sandau's constitutional rights were not impaired by the officers' use of force, it is unnecessary to determine whether the officers are entitled to qualified immunity in connection with Sandau's allegations of excessive force.

Defendants' respective motions for summary judgment should therefore each be granted to the extent premised on the theory that Sandau suffered no deprivation of constitutional rights in connection with the officers' use of force in effecting Sandau's arrest.

### c.    Manner of Sandau's Detention

### i.    Constitutional Violation

When Sandau was extracted from her home by defendant Wood, she was clothed in one long and one short T-shirt that covered her only to mid-thigh when she was in a standing position.  After the officers placed her in handcuffs and started walking her to Wood's car, Sandau began requesting that the officers permit her to put on some pants, but the officers ignored her requests.  At least by the time Wood placed her in his car, he was aware that she wore no clothing other than the T-shirts, but he took no action either to obtain additional clothing for her or to cover her nakedness in any way.[9]  Later, at the Central Precinct, Sandau was fingerprinted and photographed, and the bottom of her shirt lifted to expose her semi-nudity, before she was given pants to wear.  Sandau alleges that this treatment constituted a violation of what she characterizes as her Fourth Amendment right to privacy and freedom from intrusion on her bodily integrity.

The Ninth Circuit has observed that:

---

[9]  As noted above, Wood re-entered Sandau's home following her arrest, ostensibly to secure it.  Before leaving the premises, Wood could have obtained something with which to cover Sandau's nakedness, but elected not to do so.

Page 27 - FINDINGS AND RECOMMENDATION

The Fourth Amendment proscribes only "unreasonable" searches and seizures. However, the reasonableness of a search or a seizure depends "not only on when it is made, but also on *how* it is carried out." *Tennessee v. Garner*, 471 U.S. 1, 7-8, 85 L. Ed. 2d 1, 105 S. Ct. 1694 (1985) (emphasis in original). In other words, even when supported by probable cause, a search or seizure may be invalid if carried out in an *unreasonable* fashion. . . .

Whether an otherwise valid search or seizure was carried out in an unreasonable manner is determined under an objective test, on the basis of the facts and circumstances confronting the officers. The Supreme Court and this court have discussed the factors relevant to that objective test primarily in cases involving police use of excessive force in making stops or arrests. *See, e.g.*, *Graham v. Connor*, 490 U.S. 386, 387, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989); *Ward v. City of San Jose*, 967 F.2d 280, 284 (9th Cir. 1991). In *Graham*, a case in which officers used excessive force in making an investigatory stop of a diabetic, the Supreme Court stated that determining the reasonableness of a seizure "requires careful attention to the facts and circumstances *of each case*, including the severity of the crime at issue, whether the suspect poses an *immediate threat* to the safety of the officers or others, and whether he is *actively resisting arrest* or attempting to *evade arrest* by flight." *Id.* at 396 (emphasis added). The inquiry is not limited to the specific Graham factors, however. Rather, we must look to whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*, and then must consider "whether the *totality* of the circumstances justifies a particular sort of seizure." *Id.* (emphasis added), *quoting Garner*, 971 U.S. at 8-9.

*Franklin v. Foxworth*, 31 F.3d 873, 875 (9th Cir. 1994) (emphasis original). The *Franklin* court

determined that although the *Graham* factors were developed in response to cases involving

allegations of excessive force, those factors, among others, were in addition potentially helpful in

determining the reasonableness of affronts to dignity and privacy that take place in the course of

a seizure. *See id.* at 876. The court ultimately concluded that it was a clear violation of the

Fourth Amendment for officers to require a sick and partially naked man with his genitals either

in view or potentially in view to remain for two hours in a location and position where he was

visible to officers searching his home. *See id.*

Defendants Cass and the City of Portland argue, persuasively, that once Sandau was

handcuffed, it would have been more intrusive on her privacy to obtain clothing for her and to dress her than to wait until a female officer could assist her at the Central Precinct.  However, it would not have been difficult for the officers to provide Sandau with some form of coverage other than pants during her transportation, or to arrange for her to be clothed promptly upon her arrival at the Central Precinct.

The record suggests no reason that might have justified the officers in failing to take any measure to permit Sandau to avoid a significant intrusion on her privacy and dignity.  Sandau did not present a risk of flight or violence.  The circumstances of Sandau's detention were unreasonably degrading and unduly invasive of her privacy.  I conclude that the manner of Sandau's detention violated her rights under the Fourth Amendment.  Defendants' respective motions for summary judgment should therefore each be denied to the extent premised on the theory that Sandau suffered no deprivation of constitutional rights in connection with the manner of Sandau's detention.

## ii.    Qualified Immunity

The officers may be entitled to qualified immunity for their conduct in connection with the manner of Sandau's detention only if a reasonable police officer could have believed under the circumstances confronting Cass and Wood that it was proper to require Sandau to undergo transportation and processing in a state of partial undress.  In the absence of any evidence that the officers reasonably believed their safety would have been at risk had they taken reasonable measures to avoid a significant intrusion on Sandau's privacy and dignity, a reasonable officer would necessarily have understood that Sandau was entitled, at a minimum, to be transported to and processed at the Central Precinct without exposing her nakedness to the public view.  In

Page 29 - FINDINGS AND RECOMMENDATION

consequence, Cass and Wood are not entitled to qualified immunity in connection with the role

they played in the manner of Sandau's detention.    Defendants' respective motions for summary

judgment should therefore each be denied to the extent premised on the theory that the officers

enjoyed qualified immunity in connection with the manner of Sandau's detention.

### 3.        Claim Under 42 U.S.C. § 1983 as to the Municipal Defendant

Municipal liability under 42 U.S.C. § 1983 differs from individual liability in several

respects.  Primarily, municipal liability under Section1983 requires proof of a policy or custom

that caused the deprivation of the plaintiff's constitutional rights.  *See Monell v. Dep't of Soc.*

*Servs.*, 436 U.S. 658 (1978).  In addition, municipalities cannot assert qualified or absolute

immunity from suit in Section 1983 litigation, *see Leatherman v. Tarrant County*, 507 U.S. 163

(1993), and punitive damages may not be awarded against municipalities, *see City of Newport v.*

*Fact Concerts, Inc.*, 453 U.S. 247 (1981).

There are three methods for proving the existence of a municipal policy or custom:  (i) by

showing a longstanding practice or custom which constitutes a municipality's standard operating

procedure; (ii) by proving that the decision-making official was, as a matter of state law, a final

policymaking authority whose acts may constitute official policy; and (iii) by showing that an

official with final policymaking authority either delegated that authority to or ratified the decision

of a subordinate.  *See*, *e.g.*, *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005).  Once

the existence of a relevant municipal policy or custom is established, it is a Section 1983

plaintiff's burden to establish that the policy or custom was both the cause in fact and the

proximate cause of the defendants' deprivation of the plaintiff's federally-protected rights.  *See*

*Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

Page 30 - FINDINGS AND RECOMMENDATION

A municipal policy may be inferred from "widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded." *Menotti*, 409 F.3d. at 1148. A plaintiff may prove a widespread practice where several different officers independently engage in the same unconstitutional conduct. *See id.* However, the actions of a single officer who committed multiple violations are insufficient to establish a widespread practice. *See Sloman v. Tadlock*, 21 F.3d 1462, 1471 (9th Cir. 1994).

Plaintiffs may also establish municipal liability under Section 1983 where constitutional deprivations can be attributed to a municipality's failure to correct a specific problem despite its awareness of the risk of constitutional injury. *See Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002); *Chew v. Gates*, 27 F.3d 1432, 1445 (9th Cir. 1994). Moreover, evidence of inadequate general oversight may be sufficient if the absence of oversight was a cause of a Section 1983 plaintiff's injury. *See Larez v. City of Los Angeles*, 946 F.2d 630, 647 (9th Cir. 1991).

Sandau alleges the City's municipal liability in connection with the warrantless entries into her home and the manner of her detention. As noted above, Sandau's constitutional rights were not violated in connection with Cass and Wood's entry into her home to secure the premises following her arrest, so the court is called upon to analyze only whether the City may be liable as to Sandau's Section 1983 claim in connection with Wood's initial entry and the manner of Sandau's detention.

### a.    Wood's Initial Entry

Oregon's so-called community caretaking statute authorizes police officers, among other things, to:

[E]nter or remain upon the premises of another if it reasonably appears to be

Page 31 - FINDINGS AND RECOMMENDATION

necessary to:

>(A) Prevent serious harm to any person or property;
>
>(B) Render aid to injured or ill persons; or
>
>(C) Locate missing persons.

O.R.S. 133.033(1), (2)(a).  It is undisputed that the Portland Police Bureau has a written policy implementing or in connection with the community caretaking statute, providing, in full, as follows:

>a. Any member or person may make an emergency entry of any premise, without the consent of the person in possession or entitled to possession thereof, if they have reasonable basis for believing the entry into the premise is required to:
>
>>1. Prevent serious harm to any person or property.
>>
>>2. Render aid to injured or ill persons.
>>
>>3. Assist persons who are mentally incompetent/unable to care for themselves, are unaccompanied by a competent party, and may be in a situation where their welfare is at risk.
>
>b. Members making an emergency entrance into a premise must write the appropriate report(s) explaining their actions.

PPB Policy 631.60.

Sandau alleges that Policy 631.60 constitutes a policy of permitting and encouraging police officers to enter private homes under circumstances that do not fall within the exigency or emergency exceptions to the Fourth Amendment's prohibition of warrantless entries into homes. Sandau further alleges that Policy 631.60 was a cause in fact and proximate cause of the injury she suffered when Wood initially entered her home.

It is undisputed that Policy 631.60 constitutes a policy promulgated and practiced by the

City.  Moreover, on its face the policy would permit warrantless entry of private homes under circumstances outside the scope of either the exigency or the emergency exceptions to the Fourth Amendment prohibition against warrantless entries:  it permits police officers to enter homes when they believe an unaccompanied, mentally incompetent person "*may* be in a situation where [his or her] welfare is at risk."[10]  Policy 631.60(a)(3) (emphasis supplied).  In addition, by arguing that his entry was proper pursuant to the community caretaking statute and implementing policy, Wood has essentially conceded that the policy played a causal role in the deprivation of Sandau's constitutional rights.  Defendants Cass and the City of Portland's motion for summary judgment should therefore be denied as to the City's municipal liability in connection with Wood's initial entry into Sandau's home.

### b.    Manner of Sandau's Detention

Sandau articulates two arguments in support of her theory that the City could be liable under 42 U.S.C. § 1983 in connection with the manner of her detention.  First, she suggests that it may be a widespread practice not to reprimand police officers for transporting prisoners to the Central Precinct in a state of undress.  In support of this argument, she points to evidence that prisoners have appeared in police custody at the Central Precinct in a state of undress on at least 18 occasions in the past seven years.  However, Sandau points to no evidence establishing or suggesting that any of these instances occurred in violation of the prisoner's Fourth Amendment rights.  To survive Cass and the City's motion on this theory, Sandau would need to offer

---

[10]  That is, Policy 631.60(a)(3) permits officers to effect warrantless entries on the basis of speculation, whereas the exceptions to the Fourth Amendment prohibition permit such entries only under circumstances giving rise to the affirmative, reasonable belief that significant harm would occur if the officer did not enter the premises.

Page 33 - FINDINGS AND RECOMMENDATION

evidence of a widespread practice of transporting and processing prisoners in a state of total or partial undress under circumstances in which the prisoner's Fourth Amendment rights were violated.

Second, Sandau suggests that Wood may have been a person with effective policymaking authority with respect to his decision to transport Sandau without making arrangements to protect her privacy and dignity. However, Sandau offers no evidence in support of this theory.

Sandau has not sustained her burden to establish that the deprivation of her rights was caused by a municipal policy. Defendants Cass and the City of Portland's motion for summary judgment should therefore be granted as to the City's municipal liability in connection with the manner of Sandau's detention.

### B.    Battery

Under Oregon law, battery is an intentional, nonconsensual, offensive touching. *See*, *e.g.*, *Bakker v. Baza'r, Inc.*, 275 Or. 245, 249 (1976). Sandau alleges that Wood committed battery on her person when he used sufficient force while effecting her arrest to leave bruises on her arm.

Oregon law provides that a "peace officer making a stop may use the degree of force reasonably necessary to make the stop and ensure the safety of the peace officer, the person stopped or other persons who are present." O.R.S. 131.615(5). Under Section 615(5), a claim for battery may not lie against a police officer using only the degree of force necessary to effect an arrest. *See*, *e.g.*, *Gigler v. Klamath Falls*, 21 Or. App. 753, 763 (1975). As discussed above, Wood's use of force was not in excess of that required to effect Sandau's arrest. Under clear Oregon law, Sandau therefore may not maintain a claim for battery against Wood in connection with her arrest. *See id.*; *see also*, *e.g.*, *Saman v. Robbins*, 173 F.3d 1150, 1157, 1157 n. 6 (9th

Page 34 - FINDINGS AND RECOMMENDATION

Cir. 1999) (where Section 1983 claim premised on excessive force fails, battery claim arising out of the same facts also necessarily fails). Wood's motion for summary judgment should therefore be granted as to the common-law battery claim.

## CONCLUSION

For the reasons set forth above, I recommend that Sandau's motion (#86) for leave to amend her complaint be granted, that City of Portland's and Cass's motion (#63) for summary judgment and Wood's motion (#76) for summary judgment be granted in part and denied in part as follows. Each dispositive motion should be granted as to Sandau's Section 1983 claim to the extent premised on Wood's initial entry into Sandau's home as to the individual defendants only, on qualified immunity grounds; to the extent premised on Wood and Cass's use of force in effecting Sandau's arrest as to all defendants, on the ground that Sandau suffered no constitutional deprivation in connection with the officers' use of force against her; to the extent premised on the manner of Sandau's detention as to defendant City of Portland only, on the ground that Sandau has not established the City's *Monell* liability in connection with the manner of her detention; and to the extent premised on the officers' entry into Sandau's home following Sandau's arrest, on the ground that Sandau suffered no constitutional deprivation in connection with that entry; and as to Sandau's common-law battery claim. The motions should otherwise each be denied.

## SCHEDULING ORDER

These Findings and Recommendation will be referred to a district judge. Objections, if any, are due September 16, 2009. If no objections are filed, then the Findings and Recommendation will go under advisement on that date. If objections are filed, then a response

Page 35 - FINDINGS AND RECOMMENDATION

is due within 10 days after being served with a copy of the objections.  When the response is due

or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 1st day of September, 2009.

  /s/ Paul Papak                            
Honorable Paul Papak
United States Magistrate Judge

Page 36 - FINDINGS AND RECOMMENDATION